Jared Green for Appellant Charles E. Byrd And Judge Callahan, if I could reserve three minutes, I'd appreciate it, for rebuttal. I'll try to keep track of my time here. Does that get any higher? He seems like it's... Alright, um... Can you hear me right now? Okay. We can hear you okay if you keep your voice up, so... Okay, great. So, Your Honors, this case is pretty straightforward. My client, Charles Byrd, was a pretrial detainee at the time in a minimum security jail in Arizona. On October 28, 2004, he was subjected to a highly unreasonable search. He was in his cell reading, and all of a sudden, jail officers stormed in with taser guns drawn, screaming at him to shut the F up continuously and take off his clothes down to his underwear. My client followed the orders. They then rushed him into a main, large jail room called the multipurpose room. In that room, there were about 25 officers, about 10 feet away from him, 25 people facing him. A bunch of them were uniformed officers, and then a bunch of them were just people wearing civilian clothes. I think we know what the facts are, so why don't you go to the issues, since you don't have a lot of time. Fair enough. And I know that the jury, certain questions went to the jury, so you've got some factual findings that I don't believe you're contesting that relate to it. So why don't you tell us the legal issues that are left. Correct. And just to clarify, the jury made three very specific findings, and obviously for purposes of this appeal, we're assuming that those are true, and we're challenging the constitutional decisions the court made on direct and verdict before the jury got it. So basically, we all know the facts. Really, the issue is whether or not this search was unreasonable under Bellevue-Wolfish, based on the four-factor balancing test. We believe it clearly fails that test. We also believe it clearly fails the Turner reasonable relations test, and we also believe that looking at Mitchenfelder and Grumman, the two nine circuits, cross-gender, female to male searches in the prison context, if you analyze those cases, those are easily distinguishable, and more importantly, their reasoning compels a finding of unconstitutionality in this case. Now, I could take any one of those if-chews, whichever Your Honors prefer. We have cases dealing with searches of arrestees, and we require some reasonable suspicion before a strip search. And there are also cases, both ours and the Supreme Court's, on searches of prisoners. Pretrial detainees, are they more like arrestees, or are they more like prisoners? That's a good question, Your Honor. I think there are probably ñ I mean, they are arrestees in that they haven't been convicted of a crime yet. I guess technically they've been placed in general population, so if there's any distinction between that and U.S. v. Kai, the case where you offered your reluctant concurrence in, you know, this search would be blatantly unconstitutional if it was just ñ if they were just arrestees. So we're not arguing that, though. Arguably, they would be ñ this would be unconstitutional if these were convicted felons. I'm not exactly sure where they are, but I imagine a pretrial detainee is much closer to an arrestee than to a convicted inmate. All right, but you have to ñ some of the things you obviously have to worry about, if someone's ñ they're pretrial, they're in custody, you've got to worry about them smuggling drugs, you've got to worry about danger to other prisoners. You know, you have danger to the staff, all of those type of things. So ñ Exactly. Now, that's exactly what our argument is, which is ñ As opposed to someone ñ people that are walking around before they've been arrested, we can't assume that, you know, that that's a different situation. Right. And our argument here is, unlike in a lot of the strip search cases or partial strip search cases, court C, we're not arguing that no search should have occurred, unlike U.S. v. Kai, unlike a lot of those pre ñ those arrestee cases, or even unlike Mitchenfelder and Grumman, where the opponents argued there should have been no search. We're not arguing that. We understand that a jail ñ there needs to be security. Sometimes you have to do blanket searches. Right. Well, so what are you arguing should have happened? We're arguing that rather than having a cadet in street clothes who wasn't identified, she's standing against the wall. My client testified under oath he had no idea who she was. She wasn't wearing a name badge.  Well, it seems so that the problem that you have is the jury found that the question was posed about whether the search was for other than security. They didn't find ñ they found against you on that. So it's a security search. True. And so you make a ñ you kind of make a throwaway equal protection argument, but you don't really, you know, it doesn't ñ it's not very developed in the record, and that how he's similarly situated. Well, again, our argument on equal protection was the equal protection claim was dismissed before any evidence was put in. Right. There's a facially discriminatory policy. Right. There's a written policy that applies to male inmates, and it's different as it applies to female inmates. Right. So it's facially discriminatory. No one would argue against that. The question is whether or not it meets the intermediate scrutiny test. Right. Excuse me. Was that issue developed to the district court? I looked in the record to see whether that argument had ever been made, and I didn't see anything until after. Yeah, at the time, now, I didn't represent Mr. Bird below, and at that point in the proceedings, Mr. Bird was ñ he was going pro per. So, you know, the court just dismissed ñ the defendants moved for summary judgment on the equal ñ I'm sorry, on the Fourth Amendment and the substantive due process claim. They didn't move for summary judgment on the equal protection claim, but the court, sua sponte, dismissed for failure to state a claim. But what our biggest argument there is, is there's an intermediate scrutiny standard because it's gender-based, and the burden is on the government in that situation to show that an important governmental interest is further. But if he didn't raise that concern about the difference in the strict search policy or the search policy between men and women to the district court, can we reach it at this point? Well, I think you can because he was proceeding pro per, and, you know, courts are required to liberally construe pro per, especially civil rights complaints, and before the judge on the summary judgment and highlighted by the county was the actual policy, which states a different policy applies to men and women. He claimed, you know, he's proceeding pro per. He didn't probably make the best argument in response to that, but I think the court can consider whether or not that was an erroneous legal decision, and clearly it was. Now, maybe later that could have been developed, maybe evidence, you know, later. Well, apparently the later that you talk about, there was, he does claim that he was abused, and he, you know, and that's why he's, you know, more akin to the situations that women are in. However, there's absolutely no evidence that was ever shown on that issue that they would have had any knowledge about that, and so that kind of pulls out another leg of the table. Is this for equal protection or for security? Well, you kind of, it sort of crosses over to your due process and your equal protection, I guess. Well, just, I don't know which one we're going on, but in terms of equal protection, I don't see how evidence that was developed, and I have to stop in a minute, how evidence was developed at trial relating to the Fourth Amendment could possibly show that the government met its burden on an equal protection claim that was dismissed. But just, I want to get back to the security issue that you raised, Judge Callahan. We're, I agree, we all agree that security is very important in the jail, but in this case, unlike Mitchenfelder and Grumman, security was, it was not convicted felons. These are pretrial detainees, so security is slightly reduced. There is no evidence in this record that any security threat existed that day. There's no evidence of what the security threat was. There's no history of contraband problems, unlike in Mitchenfelder. Nonetheless, we still think security is important. All that we're saying, and in fact, I think that the suspicionless search was arguably justifiable. So we're not arguing that the search itself was improper, the decision to search. It was the manner in which it was conducted by people who are civilians. They weren't even officers. When there were numerous male uniformed officers standing ten feet away and perfectly available, there's no rational reason why we would have street-clothed civilians conduct this very intimate search of his testicles, perineum, inner buttocks. Your time is down to a minute. Do you want to retain? Yes, I'll hold for the last minute. Thank you, Your Honors. Good morning, Your Honors. Eileen Dennis Gilbride for the defendants. Good morning. I'd like to turn your attention, just so we can clarify the issue in this case, to page 12 of Plaintiff's reply brief. That's where he says he's not challenging the jury verdict in the defendant's favor on the search and the manner in which it was conducted and the manner it was applied to the defendant. All he's arguing is about the Rule 50 ruling before the case was sent to the jury, and that is the facial challenge to the policy. Well, the jury wasn't given the real question about whether it's okay to conduct a strip search under this situation. The jury only said, did she grope him, as opposed to moving his privates apart and touching them and looking down, did she grope him? That's all the jury had. It didn't have the other issue. The judge had taken that out. So the question of whether it's okay for the female under these facts to conduct what's called a strip search, according to our jurisprudence, because he's down to very thin underwear, wasn't put to the jury. That's what the judge kicked out. Because it's a legal issue under the facial challenge. Well, it's not entirely facial. To the extent... For example, the testimony and the evidence given by, was it O'Connell is the person who did it? Yes. She said that there were 32 to 45 cadets in that room, two of whom were women. Several of whom were women. He said one or two, and she said a couple. Yes. A couple of whom were women. Now, I think part of the problem or question he's raising is, if you had, say, 32 cadets and 29 of those were men, why was it necessary to have a woman do this to this male? And indeed, it could have been 43 cadets, two of whom were women. Why was there any purpose or any justification for having a cross-gender search involving the touching of this person, the looking at him, et cetera? That's really the question the judge took away from the jury. The question is whether the policy, DH3, which is at... Policy. I'm talking about the facts on the ground. And that's the problem, Your Honor. You all want to just slur it into policy and say, well, there might be a time when there was a necessity for a woman to come and search a man. Yes, there might be. The facts of this case are that there are an awful lot of men there, cadets, who could have conducted the search. How do you get around that problem? In a couple of ways, and here's the first answer. The first answer is that when we're making a facial challenge, which is what he is making here, he is challenging the Rule 50 ruling, he has to show on a facial challenge that there are no circumstances under which this policy could ever be constitutional. That's the first answer. The second... You call it a facial challenge. Yes. How do I know that this is not, at least in part, an as-applied challenge? Because the only as-applied challenges that were raised and tried below... Don't care about what was tried because it didn't go to trial. The judge zapped his case out before trial. Correct. I think what Your Honor is trying to do, respectfully, is change... I'm not trying to do anything. No, I understand. My concern is what you're trying to do is make it facial and therefore say, well, there could be some circumstance at the end. I'm asking, how do I know from this record that this could only be a facial challenge? And he wasn't complaining, as he sounded like he was complaining, about the fact that there was no need for a woman to be doing this. He didn't complain about it at the time. Now, if he had said, I object, I want to be searched by a male, perhaps something else could have been done. But he never... But the evidence was that they had told him, you say one word, you're going to get tasered. You sit there... Not tasered, Your Honor. You're going to get whatever you get. Removed from the room. They said, you're going to be penalized if you open your big mouth. You sit there, you go out there, you keep your mouth shut, don't say a thing, you just do what they tell you to do. So, is he supposed to violate that? If he really... In this wonderful... Whether... In this jail that's warm and wonderful and run by, who is it, what's his name? Sheriff Arpaio. Yes, who believes in running a nice, soft, easy... So, they say to this guy, if you say a word, you've had it. So, he can't object. So, let's say he doesn't object. Let's... All right? And so, what's the justification for having a woman do the cross-gender search? And to answer that, I would address you to the excerpt of record, page 333 and 334. That is where Captain Peterson testifies. He's asked, why can't you ever have only males search males? And he says, I'm sorry, that is an impossibility. I never have enough officers, male officers available to search all of the 10,000 inmates, most of whom are male in our jail. I'm sorry, I can... I never have enough... Were there 10,000 people in this room? There weren't 10,000... 10,000 were there? 93, Your Honor. And you had... 30... You had... 25 to 30 cadets who were searching 90... With 32 to 45 cadets doing the searches. And you're saying that on those... Plus, I take it the officers holding guns and such... The officers were the supervisors, ensuring that the cadets were safe and that they were following policy. And then the other officers were at the same time searching the cells and the clothing that was left in the cells. So no cadet could do two people. It could only be one cadet per person. At a time. No, at a time, because... Why was it necessary to have one of the two women conduct the search on this person? Unless it was for training, but we're stipulating it wasn't a training exercise. The jury found that it wasn't a training exercise. Correct. So it's not for training, and so we have... I think it was a legitimate... In fact, the testimony is uncontroverted from Captain Peterson, from Deputy O'Connell, and from Sheriff Arpaio, that you can never do a search... The only time they do these mass searches is for security purposes. There was information that there was contraband, there were fights, and when they have this information, to get 93 inmates out of their cells at the same time and to search them all in one place while the SRT, the Special Response Team, is searching the cells and the clothing in the cells, you have to have a full complement of officers. A full complement of officers includes females, because they just don't have enough males to do that kind of a search without the female assistants. Well, that's why I'm asking you. How is it that they couldn't do... two men couldn't do that search? Why couldn't they do the search? It sounds like... Because they were searching the other inmates. Your Honor, there has to be... As I said, they can't do two seriatim. They have to do them all at one time, right? They're doing them all at one time in one... When they're doing it, I'm saying they had to. As a matter of security, they had to do them all at once. They can do every one at the same time. Nobody could be done first and second. Oh, no, no, no, no, no, no. With only 25 or 30 officers and 93 inmates, you can't have a one-on-one search all at the same time. They were paraded in in rows so that it was orderly, and they could keep a watch on everybody. And the other inmates... So how many were in there at a time? The record does not say. But they all came in. Once they were finished with their search, they sat down and faced the wall. So at one time, when it was all was finished, everybody was in there at the same time. I'm worried about the searching when it's going on. How many are being searched at once? I believe the testimony was there were rows of 6 or 8 and then 5 cadets deep. So in other words, the inmates would be... I'm not talking about how many cadets there were. I'm talking about how many prisoners there were. I believe there were 6 or 8 at a time coming in, being searched, and then they'd sit down, and the next row would come in, and the next row would come in. It wasn't necessary to have female cadets searched for security purposes. Otherwise, Your Honor, the female cadets don't get to do anything. It is a matter of their... They don't get this training exercise. It's not a training exercise, Your Honor. The jury found that it wasn't. And it wasn't. So they don't get it. But I never saw our cases as saying you have to have one-on-one.  for equal officer opportunity and employment. I think... I see I only have 30 seconds remaining after all of that. But out of all the permutations and combinations that the inmates could have argued about here, there is an overarching consideration, three overarching considerations. One is jail safety. And it's uncontroverted. There was testimony that we had to have a full officer complement to maintain jail safety. Deference to the jail administration, two. And three, even more deference because we're talking about a state jail system here. And in fact, Your Honor, being a woman, I wouldn't have thought of this, but the males in my office indicate that they would much rather have been searched by a female officer than a male officer. Well, I don't think that's probably in the record, right? It's not in the record, but... Okay. We're not going to go there on that. But for every one male who's going to complain about the female searching him, you're going to have another male that's complaining about the male searching him. In fact, they don't get a chance to complain about going to a female doctor or a male doctor. The jail administration has to do what it has to do to keep jail security and to keep the officer's safety, and that's why the policy is what it is. We'd ask you to affirm. Thank you for your argument. Your Honors, I'll make this quick. Many men in my office said the opposite, so... Well, we're not going to add that to the record either, so... Okay, fair enough. But you both get to say it, this argument. About the facial challenge, the argument that only policy DH-3 is before the court in some vague way, disattached from the facts of the actual search, is just inconsistent with Fourth Amendment law, which clearly says the totality of the circumstances must be analyzed in any given case. And it's just obviously incorrect that you can argue that some written policy as it exists on paper is the issue rather than what the search is in practice. In terms of security, my last 20 seconds, unlike in all of these other cases, I want to emphasize again, the county could not rebut the fact that there were numerous male officers standing 10 feet away at all times. That's what the record says. So security would not have been impaired if those officers stepped up and did the search. Plain and simple. No matter what was just said, that cannot be rebutted. It's in the record, and security would have been fully, fully advanced if the male officers rather than the female conducted this search. All right, your time's expired. Thank you both for your argument. This matter will stand submitted. I would like to publicly acknowledge that we are grateful for Pro Bono Council taking cases as it does facilitate the court in deciding matters.
judges: Fernandez, Callahan, Ikuta